ROB BONTA
Attorney General of California
LISA W. CHAO
Supervising Deputy Attorney General
JOHN C. KEITH
Deputy Attorney General
State Bar No. 229755
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6251
  Fax:  (916) 731-2144
  E-mail:  John.Keith@doj.ca.gov
*Attorneys for Appellee*
*California Franchise Tax Board*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **In re:**<br><br>**ANTHONY SCOTT LEVANDOWSKI,**<br><br>              Reorganized Debtor. | Case No. 4:25-cv-02713-YGR<br><br>On Appeal from the U.S. Bankruptcy Court for the Northern District of California, Chapter 11,<br>Case No. 3:20-BK-30242-HLB |
| **PETER KRAVITZ, in his capacity as Trustee of the Levandowski Residual Liquidation Trust; ANTHONY SCOTT LEVANDOWSKI, Reorganized Debtor,**<br><br>              Appellants,<br><br>    v.<br><br>**CALIFORNIA FRANCHISE TAX BOARD; UNITED STATES OF AMERICA,**<br><br>              Appellees. | **APPELLEE'S BRIEF OF CALIFORNIA FRANCHISE TAX BOARD**<br><br>Dept:     1<br>Judge:   Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................. 1

Statement of the Case ................................................................................................. 3

I.     While Working on a Self-Driving Vehicle Project at Google, Levandowski
       Starts a Competing Company and Then Sells It to His New Employer,
       Uber, Which Agreed to Indemnify Him Against Claims By Google ................... 3

II.    Google Commences Arbitration Against Levandowski, Leading to a $179
       Million Judgment ............................................................................................... 4

III.   Levandowski Files Bankruptcy, and He, Google, and Uber End up in
       Bankruptcy Court Litigation that Is Finally Resolved by a Settlement
       Agreement and Settlement Payment .................................................................. 4

IV.    The Bankruptcy Court Grants Levandowski's Tax Motion and
       Confirmation Motion, this Court Reverses, and on Remand the Bankruptcy
       Court Holds that the Settlement Payment Is Taxable Income .............................. 5

Summary of Argument ................................................................................................. 7

Standard of Review ..................................................................................................... 9

Argument ..................................................................................................................... 9

I.     The Settlement Payment Is Gross Income Under IRC Section 61........................ 9

       A.     IRC Section 61's Broad Definition of Gross Income Includes
              Income Realized by Indirect Means Like the Payment from Uber to
              Google for Levandowski's Benefit ............................................................ 9

       B.     The Settlement Payment Was a Type of Indirect Payment that
              Constituted Gross Income in the Form of Compensation for
              Levandowski's Services to Uber ............................................................. 10

II.    Appellants' Arguments that the Settlement Payment Is Not Gross Income
       All Fail ............................................................................................................. 14

       A.     Appellants' Reliance on the "Complete Dominion" Requirement of
              *Glenshaw Glass* Is Unavailing .............................................................. 14

              1.     *Glenshaw Glass's* "Complete Dominion" Standard Is Not
                     Exclusive ..................................................................................... 14

              2.     *Glenshaw Glass's* "Complete Dominion" Standard Is
                     Satisfied Here .............................................................................. 16

       B.     The Court Need Not Decide Whether the Settlement Payment Was
              Gross Income in the Form of Discharge of Indebtedness, and, Even
              if It Does, Levandowski Cannot Exclude the Settlement Payment
              Under IRC Section 108 Because the Payment Was Compensation
              for Services ........................................................................................... 20

       C.     Appellants Have Not Demonstrated that Any Other Exclusion from
              Gross Income Applies ........................................................................... 23

              1.     The Settlement Payment Was Not Akin to a Nontaxable
                     Insurance Payment ...................................................................... 23

i

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

a.    The Settlement Payment was not nontaxable as
returning "lost capital" to Levandowski in the

4

manner of accident, health, or similar insurance
payments ......................................................................... 23

5

b.    The Settlement Payment was not akin to insurance
under the test of *AMERCO & Subsidiaries v.*

6

*Commissioner*................................................................... 25

7

(1)    The Indemnification Agreement and
Settlement Payment did not meet commonly

8

accepted notions of insurance ............................... 26

9

(2)    There was insufficient risk distribution for
there to be insurance............................................. 29

10

(3)    The Bankruptcy Court Was Correct to
Conclude that Principles of Federal Income

11

Taxation Weigh in Favor of Finding Gross
Income Here ......................................................... 30

12

2.    The tax benefit rule does not apply ................................ 30

13

3.    The Settlement Payment was not a Working Condition
Fringe ............................................................................. 33

14

a.    Levandowski Was Not, as Required, a Current
Employee of Uber at the Relevant Time.......................... 33

15

b.    The settlement payment would not have been
deductible under IRC section 162 ................................... 34

16

4.    The Settlement Payment Was Not a Deductible
Reimbursement ............................................................... 36

17

a.    The settlement payment was not deductible under
IRC section 162................................................................ 36

18

b.    The Settlement Payment Was Not an Expense Paid
or Incurred Within a Current Employment

19

Relationship Between Uber and Levandowski ................ 36

20

c.    The Settlement Payment Was Not Made Pursuant to
an Accountable Plan......................................................... 38

21

Conclusion ............................................................................................... 39

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

CASES

*1-800 Contacts, Inc. v. Steinberg*
107 Cal. App. 4th 568 (2003) ................................................................. 38

*Actavis Lab'ys, FL, Inc. v. United States*
161 Fed. Cl. 334 (2022) ......................................................................... 34

*Agric. Lab. Rels. Bd. v. Ruline Nursery Co.*
115 Cal. App. 3d 1005 (1981) ................................................................ 31

*Alexander v. Comm'r*
69 T.C.M. (CCH) 1792 (T.C.) ................................................................ 12

*Am. Mut. Life Ins. Co. & Subsidiaries v. United States*
267 F.3d 1344 (Fed. Cir. 2001) .............................................................. 32

*AMERCO & Subsidiaries v. Commissioner*
96 T.C. 18 (1991) ................................................................ 8, 25, 26, 29

*Armour & Co. v. Wantock*
323 U.S. 126 (1944) ............................................................................... 15

*Atel Fin. Corp. v. Quaker Coal Co.*
321 F.3d 924 (9th Cir. 2003) .......................................................... 9, 11, 21

*Avrahami v. Comm'r of Internal Revenue*
149 T.C. 144 (2017) ........................................................................ 26, 29

*Bank of the West v. Super. Ct.*
2 Cal. 4th 1254 (1992) ........................................................................... 26

*Biehl v. Comm'r*
351 F.3d 982 (9th Cir. 2003) ............................................................ 36, 37

*Biehl v. Comm'r of Internal Revenue Serv.*
118 T.C. 467 (2002) ........................................................................ 33, 39

*Caylor Land & Dev., Inc. v. Comm'r of Internal Revenue*
121 T.C.M. (CCH) 1205 (T.C. 2021) ..................................................... 29

*Certain Underwriters at Lloyd's London v. ConAgra Grocery Prod. Co., LLC*
77 Cal. App. 5th 729 (2022) .................................................................. 28

*Chu v. Canadian Indem. Co.*
224 Cal. App. 3d 86 (1990) ................................................................... 27

## TABLE OF AUTHORITIES
### (continued)

Page

*Clark v. Comm'r*
  40 B.T.A. 333 (1939)..................................................................................... 25

*Clougherty Packing Co. v. Commissioner*
  811 F.2d 1297 (9th Cir. 1987).......................................................................... 29

*Comm'r v. Glenshaw Glass Co.*
  348 U.S. 426 (1955).......................................................................... 7, 14, 15, 16

*Comm'r v. Indianapolis Power & Light Co.*
  493 U.S. 203 (1990)................................................................................... 16, 17

*Comm'r v. Schleier*
  515 U.S. 323 (1995).......................................................................................... 10

*Diedrich v. Comm'r*
  457 U.S. 191 (1982)............................................................................ 10, 17, 32

*Eisner v. Macomber*
  252 U.S. 189 (1920).......................................................................................... 15

*Est. of Backemeyer v. Comm'r of Internal Revenue*
  147 T.C. 526 (2016).......................................................................................... 30

*Getty v. Comm'r*
  913 F.2d 1486 (9th Cir. 1990)........................................................... 11, 12, 22, 24

*Gulf Oil Corp. v. Comm'r of Internal Revenue*
  89 T.C. 1010 (1987).......................................................................................... 29

*Harper Group v. Comm'r*
  96 T.C. 45 (1991).............................................................................................. 29

*Helvering v. Horst*
  311 U.S. 112 (1940).......................................................................................... 16

*Henry v. Comm'r of Internal Revenue*
  62 T.C. 605 (1974).................................................................................... 12, 25

*Heyn v. Comm'r*
  39 T.C. 719 (1963)............................................................................................ 12

*Hillsboro Nat. Bank v. Comm'r*
  460 U.S. 370 (1983).......................................................................................... 32

iv

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Hudspeth v. Comm'r*

4
  914 F.2d 1207 (9th Cir. 1990) .................................................................................. 30

*Huff v. Comm'r of Internal Revenue*

5
  80 T.C. 804 (1983) ........................................................................................ *passim*

6

*In re Johnson*

7
  117 B.R. 461 (Bankr. D. Minn. 1990) .......................................................... 11

8

*In re Olshan*
  356 F.3d 1078 (9th Cir. 2004) .......................................................................... 9

9

*INDOPCO, Inc. v. Comm'r*

10
  503 U.S. 79 (1992) ............................................................................................ 35

11

*James v. United States*

12
  366 U.S. 213 (1961) ........................................................................................ 16

13

*Manocchio v. Comm'r*
  710 F.2d 1400 (9th Cir. 1983) ........................................................................ 33

14

*Matula v. Comm'r*

15
  40 T.C. 914 (1963) .................................................................................. 13, 32

16

*Miller v. United States*

17
  363 F.3d 999 (9th Cir. 2004) ............................................................................ 9

18

*Moore v. United States*
  36 F.4th 930 (9th Cir. 2022) .................................................................... 14, 15

19

*Neff v. Comm'r*

20
  104 T.C.M. (CCH) 222 (T.C. 2012) .............................................................. 21

21

*O'Gilvie v. United States*

22
  519 U.S. 79 (1996) .......................................................................................... 24

23

*O'Neal v. Stanislaus Cnty. Employees' Ret. Assn.*
  8 Cal. App. 5th 1184 (2017) ............................................................................ 38

24

*Ogden Martin Sys., Inc. v. San Bernardino Cnty., Cal.*

25
  932 F.2d 1284 (9th Cir. 1991) ........................................................................ 31

26

*OKC Corp. v. Comm'r*

27
  82 T.C. 638 (1984) .................................................................................. 21, 22

28

### TABLE OF AUTHORITIES
#### (continued)

**Page**

*Old Colony Tr. Co. v. Comm'r of Internal Revenue*
  279 U.S. 716 (1929) ............................................................... *passim*

*Pineda v. Bank of Am., N.A.*
  50 Cal. 4th 1389 (2010) ............................................................... 31

*Putchat v. Comm'r*
  425 F.2d 737 (3d Cir. 1970) ............................................................... 12, 25

*R.V.I. Guar. Co. & Subsidiaries v. Comm'r*
  145 T.C. 209 (2015) ............................................................... 29

*Reese v. United States*
  28 Fed. Cl. 702 (1993) ............................................................... 24

*Ruben v. Comm'r of Internal Revenue*
  97 F.2d 926 (8th Cir. 1938) ............................................................... 18, 19, 20

*Rutkin v. United States*
  343 U.S. 130 (1952) ............................................................... 16

*Sachs v. Comm'r*
  32 T.C. 815 (1959) ............................................................... 13, 19, 20, 31

*Samuelian v. Life Generations Healthcare, LLC*
  104 Cal. App. 5th 331 (2024) ............................................................... 38

*Schwartz Rojas v. Comm'r*
  901 F.2d 810 (9th Cir. 1990) ............................................................... 32

*Sinyard v. Comm'r*
  268 F.3d 756 (9th Cir. 2001) ............................................................... 10, 17, 19, 23

*Spartan Petroleum Co. v. U.S.*
  437 F. Supp. 733 (D.S.C. 1977) ............................................................... 21

*Tarpey v. United States*
  78 F.4th 1119 (9th Cir. 2023) ............................................................... 9, 16, 17

*United States v. Anderson*
  269 U.S. 422 (1926) ............................................................... 37

*United States v. Centennial Sav. Bank FSB*
  499 U.S. 573 (1991) ............................................................... 22

1

## TABLE OF AUTHORITIES
**(continued)**

2

Page

3
4
*United States v. Eurodif S. A.*
   555 U.S. 305 (2009) ................................................................................ 18, 23

5
*United States v. Gen. Dynamics Corp.*
   481 U.S. 239 (1987) ................................................................................ 37, 38

6
7
*United States v. Hilton Hotels Corp.*
   397 U.S. 580 (1970) ........................................................................................ 35

8
*United States v. Kaiser*
   363 U.S. 299 (1960) ........................................................................................ 24

9
10
*United States v. Stein*
   No. S1 05 CRIM. 0888 LAK, 2007 WL 91350, at *6 (S.D.N.Y. Jan. 8, 2007) ............ 11

11
*Upper Deck Co. v. Endurance Am. Specialty Ins. Co.*
   2011 WL 6396413 (S.D. Cal. Dec. 15, 2011) ........................................................ 27

12
13
*Washington Capitols Basketball Club, Inc. v. Barry*
   419 F.2d 472 (9th Cir. 1969) ........................................................................ 31

14
15
*Wittenberg v. Bornstein*
   50 Cal. App. 5th 303 (2020) ........................................................................ 38

16
*Woodward v. Comm'r*
   397 U.S. 572 (1970) ........................................................................................ 35

17
18
**STATUTES**

19
26 U.S.C. (IRC)
   § 61 ...................................................................................................... *passim*

20
   § 62 ........................................................................................ 34, 36, 38

21
   § 67 ........................................................................................................ 33
   § 108 .................................................................................... 8, 21, 22, 23

22
   § 111 ........................................................................................................ 30
   § 132 ................................................................................................ 33, 34

23
   § 263 ................................................................................................ 33, 34
   § 461 ................................................................................................ 37, 38

24
Cal. Ins. Code

25
   § 22 ........................................................................................................ 27

26
   § 533 ...................................................................................................... 27

27
Cal. Rev. & Tax. Code
   § 17071 .................................................................................................. 10

28

1

2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

**OTHER AUTHORITIES**

4

26 C.F.R.

5

   § 1.61-12 ............................................................................................................ 21

   § 1.62-2 ............................................................................................................. 36

6

   § 1.132-1 ........................................................................................................... 33

   § 1.446-1 ........................................................................................................... 37

7

   § 601.601 .......................................................................................................... 34

8

20 A.L.R.3d 320 ................................................................................................... 28

9

31 A.L.R.4th 957 .................................................................................................. 28

10

I.R.S. revenue ruling Rev. Rul. 92-69, 1992-2 C.B. 51 (1992) ................................... 34

11

Ryan H. Nelson, *Workplace Harasser Liability: Assailing Moral Hazards and*

12

   *Rehabilitating the Individualist Approach*, 89 Tenn. L. Rev. 957, 990 (2022) ...................... 12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Reorganized debtor Anthony Scott Levandowski and the trustee of the Levandowski Residual Liquidation Trust appeal from the Bankruptcy Court's order holding that the settlement payment from Uber Technologies, Inc. to Google LLC for Levandowski's benefit resulted in taxable gross income to Levandowski. The appeal lacks merit because the Bankruptcy Court's order was correct.

The settlement payment easily satisfies the Internal Revenue Code's sweeping definition of gross income as all income from whatever source derived, and also falls under a specific example the Code provides: compensation for services. Uber provided Levandowski with an indemnification agreement, which he has persistently maintained was essential to his agreement to go to work for Uber and to sell to it the self-driving vehicle company he co-founded while still working at Google. The indemnification agreement governed a component of Levandowski's compensation from Uber (indemnity against liability) commonly provided for in employment contracts of highly-paid employees like Levandowski. Therefore, this case is like others where courts have held that settlement or litigation awards on claims under employment contacts are taxable compensation. Because the settlement payment procured Google's release of Levandowski's liability under the arbitration award and resulting judgment it obtained against him, this case is also, more specifically, like cases holding that an employer's payment to a third party of an employee's liability incurred in connection with the employment (whether court-ordered, made voluntarily under the terms of employment, or made pursuant to settlement as here) is taxable income to the employee.

Appellants' arguments for reversal all fail. Their argument that the settlement payment did not meet the basic definition of gross income because Levandowski supposedly lacked "complete dominion" over the funds is contrary to well-established principles of tax law. Those principles include that income may be realized by various indirect means, that the discharge by a third person of a

1

taxpayer's obligation is equivalent to receipt by the person taxed, that form should be disregarded for substance and the emphasis placed on economic reality, and that a taxpayer has complete dominion over funds when he is able to procure in their place other satisfactions of economic worth (here, Google's release of Levandowski).

Appellants' alternative arguments that the settlement payment should be excluded from gross income are also unpersuasive.  Their attempt to analogize the settlement payment to nontaxable forms of insurance fails for various reasons.  The same is true of Appellants' argument under the tax benefit rule, the gist of which is that Levandowski "received no corresponding increase in wealth" from the payment Uber made to Google.  This ignores Google's release of Levandowski and is but a variation on Appellants' "complete dominion" argument that a payment for a taxpayer's benefit cannot be taxable unless it actually places cash in his hands. Appellants also argue the settlement payment was a working condition fringe benefit of, or a deductible reimbursed expense of, Levandowski's employment with Uber.  Those arguments fail because both doctrines require the expense be deductible under another section of the Code, but the settlement payment was not; and both doctrines also require a *current* employment relationship, but Levandowski was not employed by Uber either when the indemnification agreement was entered into, when the settlement payment was made, or at any point when the expense of the settlement payment could be said to have been incurred.

For those and the following reasons, this Court should affirm.

**STATEMENT OF THE CASE**

I.   **WHILE WORKING ON A SELF-DRIVING VEHICLE PROJECT AT GOOGLE, LEVANDOWSKI STARTS A COMPETING COMPANY AND THEN SELLS IT TO HIS NEW EMPLOYER, UBER, WHICH AGREED TO INDEMNIFY HIM AGAINST CLAIMS BY GOOGLE**

While employed at Google on a self-driving vehicle project, Levandowski started his own self-driving vehicle company (Otto).  (2-ER-Trust-0426, Ex. 15[1]; Appellants' Opening Brief (AOB) 4:12-13.)  Levandowski left Google in January 2016 along with several other Google colleagues.  (AOB 4:13-14.)  Otto was sold to Uber in August 2016.  (AOB 4:14.)  As part of the sale of Otto to Uber and Levandowski's eventual employment there, Levandowski and Uber entered into an Indemnification Agreement with a California choice-of-law clause.  (AOB 4:14-15; 2-ER-Trust-0337, Ex. 13.)  Levandowski expected Google might sue him for selling Otto to a competitor like Uber, and for working with that competitor; Uber likewise recognized that Google might sue.  (AOB 4:16-18.)  The Indemnification Agreement was entered into as of the same date (April 11, 2016) as the Agreement and Plan of Merger concerning the sale of Otto (Merger Agreement) and incorporated various defined terms from the Merger Agreement.  (2-ER-Trust-0327, Ex. 13.)

The Indemnification Agreement indemnified Levandowski and certain other former Google employees against liability for various "Bad Acts," including: fraud; willful, intentional, or deliberate conduct in connection with the infringement of Google's intellectual property rights; and willful and/or intentional breach of contractual or fiduciary duties to Google.  (2-ER-Trust-0328, Ex. 13.)  Levandowski "would not have joined Uber as an employee or sold Otto to Uber without [] Uber assuming the obligations set forth in on [sic] the Indemnification Agreement;" he "considered this agreement to be a 'critical' part of the deal and 'wouldn't have done the deal without' the agreement."  (2-ER-Trust-0426, Ex. 15.)

---

[1] Citations in the form of "#-ER-Trust-####, Ex. #" refer to Appellants' Excerpts of Record, by volume, page number, and exhibit number.

3

At some point after the Indemnification Agreement was executed, Levandowski became an employee of Uber.  (AOB 28:7-8.)

## II.    GOOGLE COMMENCES ARBITRATION AGAINST LEVANDOWSKI, LEADING TO A $179 MILLION JUDGMENT

In October 2016, Google commenced arbitration against Levandowski, seeking damages, restitution, and disgorgement for his alleged breaches of contract and fiduciary duty, and alleging that he formed and ran a competing company for four years while employed by Google, took steps to form Otto during his employment at Google, and also recruited Google employees to join Otto (for the benefit of Uber) while he was still working for Google.  (2-ER-Trust-0427, Ex. 15.)  On December 23, 2019, the arbitration panel issued a final award in Google's favor (Arbitration Award), ordering Levandowski to disgorge his compensation from Google in the amount of approximately $127 million, and also ordering him to pay Google approximately $52 million in interest, attorney fees, and costs.  (*Id.*)  On March 4, 2020, the Superior Court confirmed the Arbitration Award and entered an approximately $179 million judgment in favor of Google against Levandowski (the Judgment).  (*Id.*)

## III.    LEVANDOWSKI FILES BANKRUPTCY, AND HE, GOOGLE, AND UBER END UP IN BANKRUPTCY COURT LITIGATION THAT IS FINALLY RESOLVED BY A SETTLEMENT AGREEMENT AND SETTLEMENT PAYMENT

The same day the Judgment against him was entered, Levandowski filed the Chapter 11 bankruptcy case underlying this appeal.  (2-ER-Trust-0427-0428, Ex. 15.)  Levandowski also filed an adversary proceeding against Uber seeking to enforce its obligation under the Indemnification Agreement to indemnify him against the Judgment.  (1-ER-Trust-0134, Ex. 7.)  Google intervened in the adversary proceeding and filed a claim that comprised 98 percent of the dollar value of filed claims in the bankruptcy.  (1-ER-Trust-0134-0135, Ex. 7.)

In the adversary proceeding, the parties engaged in extended discovery and brought numerous procedural and substantive motions, none of which resolved the

4

1   matter.  (2-ER-Trust-0428, Ex. 15.)  Levandowski, Uber, and Google participated

2   in a mediation in January 2022, and subsequently reached an agreement in principle

3   to resolve all disputes among them.  (*Id.*)  On February 10, 2022, Levandowski

4   filed a motion in his bankruptcy case (the Settlement Motion) seeking approval of

5   the parties' proposed settlement (the Global Resolution).  (1-ER-Trust-0127-0217.)

6   The Settlement Motion and its multiple attachments (including a Settlement

7   Agreement) totaled about 90 pages, and both the motion and the proposed Global

8   Resolution were complex and multifaceted.  (*See id.*)  On appeal, Appellants

9   summarize the terms as follows:

> As relevant here, the material terms of the Global Resolution were as
> follows: the parties would release one another, *e.g.,* Google would release
> Uber and vice-versa, Mr. Levandowski would release Google and vice-
> versa, and Uber would release Mr. Levandowski and vice-versa; Uber
> would make an "indefeasible" payment to Google ("Uber Main
> Payment"), and would also pay the estate $2 million, which would be
> used to pay claims in accordance with a proposed Chapter 11 plan.

14  (AOB 5:13-18[2].)  The Bankruptcy Court subsequently granted the Settlement

15  Motion.  (AOB 6:1.)  Here, the defined term "Settlement Payment" refers solely to

16  the "indefeasible" payment from Uber to Google (which Appellants refer to in their

17  Opening Brief as the "Main Uber Payment" and which they have sometimes

18  referred to in prior filings as the "Uber Settlement Payment").

19  **IV.  THE BANKRUPTCY COURT GRANTS LEVANDOWSKI'S TAX MOTION AND
        CONFIRMATION MOTION, THIS COURT REVERSES, AND ON REMAND
20      THE BANKRUPTCY COURT HOLDS THAT THE SETTLEMENT PAYMENT IS
        TAXABLE INCOME**

21      In March 2022, Levandowski filed with the Bankruptcy Court a "Motion to (I)

22  Determine Tax Effect of Settlement Payment or, in the Alternative, (II) Find the

23  Debtor's Plan Feasible Without Reserving for Taxes Thereon (IRS/FTB)" (the Tax

24  Motion).  (2-ER-Trust-0422, Ex. 15.)  The Tax Motion sought an order holding that

25  the Settlement Payment from Uber to Google "does not give rise to gross income

26

27      [2] Appellants state: "As used in the Global Resolution, 'indefeasible' means not
    recoverable from Mr. Levandowski's estate—for the payment of taxes, or anything else."  (AOB
28  5, n. 1.)

for the Debtor or, in the alternative, to find the Debtor's proposed plan feasible without reserving for taxes thereon." (2-ER-Trust-0426, Ex. 15.) Also in March 2022, Levandowski filed with the Bankruptcy Court a "Debtor's Combined Disclosure Statement and Chapter 11 Plan," and proceeded to seek confirmation of same (the Confirmation Motion). (2--ER-Trust-0348-420, Ex. 14; 0531-0568, Ex. 22.)

The California Franchise Tax Board (FTB) and the United States Internal Revenue Service (IRS, collectively the tax agencies) opposed the Tax Motion and Confirmation Motion. (2-ER-Trust-0448-0459, Ex. 16; 0460-0482, Ex. 17; 0509-0519, Ex. 20; 0520-0530, Ex. 21.) Over the tax agencies' objections, the Bankruptcy Court granted the Tax Motion (Tax Order) and the Confirmation Motion (Confirmation Order). (2-ER-Trust-0575-0579, Ex. 24; 3-ER-Trust-0584-0609, Ex. 26.) The tax agencies appealed. Levandowski and the Trust, as successor to the debtor-in-possession, unsuccessfully moved to dismiss the appeal as equitably moot. (3-ER-Trust-0473-0475, Ex. 31; 4-ER-Trust-0919-0934, Ex. 40.)

This Court then granted the tax agencies' appeals, reversing and remanding the Tax Order for further consideration consistent with the Court's opinion, and reversing in part the Confirmation Order, "for the bankruptcy court to consider whether the Confirmation Order must be modified or otherwise vacated due to legal error given the ruling on the Tax Order." (4-ER-Trust-0936-0937.) Following briefing on remand, the Bankruptcy Court issued a Memorandum Opinion and Order (Order on Remand) stating:

> [T]he court finds and concludes that the Uber Main Payment constituted gross income to Mr. Levandowski. The court further finds and concludes that the Uber Main Payment is not excludable from gross income as analogous to nontaxable insurance; that the "Tax Benefit Rule" does not render the Uber Main Payment nontaxable; that the Uber Main Payment was not a nontaxable Working Condition Fringe; and that the Uber Main Payment was not a deductible reimbursement for Mr. Levandowski's services on Uber's behalf.

6

(1-ER-Trust-0002, 0004, Ex. 1.)  The Order on Remand further stated that it "does not address the parties' setoff rights, does not vacate or modify the confirmation order, and does not liquidate any of Mr. Levandowski's tax liability" (*id.* at 0004), and those issues are not presented on this appeal.

## SUMMARY OF ARGUMENT

1.    The Settlement Payment is gross income under Internal Revenue Code (IRC [26 U.S.C.]) section 61, including as compensation for Levandowski's services to Uber.  It is well established that income may be realized by a variety of indirect means and that the discharge by a third person of a taxpayer's obligation is equivalent to receipt by the person taxed.  The Indemnification Agreement governed a component of Levandowski's compensation from Uber (indemnity against liability) commonly provided for in employment contracts of highly-paid employees like Levandowski.  Therefore, this case is like others where courts have held that settlement or litigation awards on claims under employment contacts are taxable compensation.  It is also, more specifically, like cases holding that an employer's payment to a third party of an employee's liability incurred in connection with the employment was taxable income to the employee.

2.    Appellants' reliance on *Comm'r v. Glenshaw Glass Co.,* 348 U.S. 426 (1955), to argue that Levandowski lacked "complete dominion" over the Settlement Payment, is unavailing.  While *Glenshaw Glass* discussed the taxpayers' complete dominion over the funds at issue as being a factor demonstrating the funds were gross income to them under the facts of that case: (a) the facts of *Glenshaw Glass* diverge greatly from those here; (b) the Supreme Court never indicated the *Glenshaw Glass* factors were meant to provide a universal or even broadly applicable test for finding gross income; (c) the Ninth Circuit has unequivocally held they do not; and (d) even if they did, such a test would be satisfied here.

3.    The Court need not decide whether the Settlement Payment was income from discharge of indebtedness (as Appellants argue the Bankruptcy Court held), or

whether, if so, it would be subject to exclusions under IRC section 108. This Court may affirm on any ground supported by the record, which reflects that the Settlement Payment was compensation for Levandowski's services to Uber. In addition, the income exclusions under IRC section 108 only apply to "pure" cancellation of indebtedness income; they do not apply where, as here, the discharge of indebtedness was only the method that gave rise to another type of income. Because the discharge of indebtedness was made as compensation for services, it is treated for tax purposes as compensation for services income.

     4.   The Settlement Payment was not akin to a nontaxable insurance payment. The Settlement Payment did not return nontaxable "lost capital" to Levandowski. Instead, it effectively returned taxable lost compensation to him by sparing him from having to personally satisfy the Judgment, which called for disgorgement of his prior compensation from Google. Appellants' analogies to accident and health insurance payments fail, and the Settlement Payment fails the test for insurance of *AMERCO & Subsidiaries v. Commissioner*, 96 T.C. 18 (1991), *aff'd*, 979 F.2d 162 (9th Cir. 1992).

     5.   The Settlement Payment was not excludable from gross income under the tax benefit rule, which the Supreme Court has admonished is of limited nature and effect. Appellants' argument, that a payment for a taxpayer's benefit is not taxable to him unless it literally puts more cash in his pocket, is inconsistent with the rule that income may be realized by a variety of indirect means, and also with cases holding that employers' payment of their employees' liabilities is taxable income.

     6.   The Settlement Payment was not excludable from gross income as a working condition fringe benefit of Levandowski's employment with Uber because it was not, as required: (a) provided within the context of a current employment relationship between Uber and Levandowski; and (b) subject to deduction under IRC section 162 if paid by Levandowski himself.

1    7.    Similarly, the Settlement Payment was not excludable from gross income

2    as a deductible reimbursed expense of Levandowski's employment with Uber due

3    to:  (a) the lack of a current employment relationship; and (b) the lack of

4    deductibility under another section of the IRC.

5                            **STANDARD OF REVIEW**

6        "A bankruptcy court's conclusions of law are reviewed *de novo*."  *Miller v.*

7    *United States*, 363 F.3d 999, 1003 (9th Cir. 2004).  "The bankruptcy court's

8    findings of fact are reviewed for clear error."  *Id.*  This approach applies to

9    determinations concerning whether something is gross income.  *See Tarpey v.*

10   *United States*, 78 F.4th 1119, 1130 (9th Cir. 2023) ("Tarpey's final challenge is that

11   the district court applied the wrong definition of gross income and erroneously

12   included money held in escrow.  We review for clear error the district court's

13   factual findings on the amount of the penalty and its legal conclusions de novo.");

14   *In re Olshan*, 356 F.3d 1078, 1083 (9th Cir. 2004) ("We apply the same standard of

15   review applied by the district court, reviewing the bankruptcy court's legal

16   conclusions de novo and its factual determinations for clear error.").  This Court

17   "may affirm [the Bankruptcy] [C]ourt's judgment on any ground supported by the

18   record, whether or not the decision of the [Bankruptcy] [C]ourt relied on the same

19   grounds or reasoning."  *Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 926 (9th

20   Cir. 2003).

21                                **ARGUMENT**

22   **I.    THE SETTLEMENT PAYMENT IS GROSS INCOME UNDER IRC SECTION**
23   **61**

24       **A.    IRC Section 61's Broad Definition of Gross Income Includes**
         **Income Realized by Indirect Means Like the Payment from**
25       **Uber to Google for Levandowski's Benefit**

26       IRC section 61(a) defines gross income as "all income from whatever source

27   derived" (except as specifically provided otherwise in Subtitle A of the IRC) and as

28

specifically including, but not limited to, fourteen listed types of income.[3]  The

Supreme Court has "repeatedly emphasized the 'sweeping scope' of this section

and its statutory predecessors."  *Comm'r v. Schleier*, 515 U.S. 323, 327 (1995)

(*Schleier*).  The Supreme Court has "also emphasized the corollary to § 61(a)'s

broad construction, namely, the default rule of statutory interpretation that

exclusions from income must be narrowly construed."  *Id.* at 328.

In addition, "[t]he [Supreme] Court has recognized that 'income' may be

realized by a variety of indirect means."  *Diedrich v. Comm'r*, 457 U.S. 191, 195

(1982).  For example, "[t]he discharge by a third person of an obligation to him is

equivalent to receipt by the person taxed."  *Old Colony Tr. Co. v. Comm'r of

Internal Revenue*, 279 U.S. 716, 729 (1929) (answering in the negative the question

"whether a taxpayer, having induced a third person to pay his income tax or having

acquiesced in such payment as made in discharge of an obligation to him, may

avoid the making of a return thereof and the payment of a corresponding tax," and

holding that "payment of the tax by the employers was in consideration of the

services rendered by the employee" and that "[i]t is therefore immaterial that the

taxes were directly paid over to the government").  As the Ninth Circuit aptly

summed it up: "If A owes B a debt, and C pays the debt on A's behalf, it is

elementary that C's payment is income to A as well as to B."  *Sinyard v. Comm'r*,

268 F.3d 756, 758 (9th Cir. 2001).

## B. The Settlement Payment Was a Type of Indirect Payment that Constituted Gross Income in the Form of Compensation for Levandowski's Services to Uber

The Settlement Payment was gross income to Levandowski under IRC section

61(a)(1), which covers "[c]ompensation for services, including fees, commissions,

fringe benefits, and similar items."[4]  It is true that Uber made the Settlement

---

[3] California law provides that IRC section 61 "shall apply, except as otherwise provided." Cal. Rev. & Tax. Code § 17071.

[4] In their Opening Brief, Appellants state: "The Bankruptcy Court correctly did not

(continued…)

1    Payment, in the most direct sense, pursuant to the Settlement Agreement.

2    However, "[w]hether a claim is resolved through litigation or settlement, the nature

3    of the underlying action determines the tax consequences of the resolution of the

4    claim," and, "[i]n characterizing the settlement payment for tax purposes, we ask,

5    'In lieu of what were the damages awarded?'" *Getty v. Comm'r*, 913 F.2d 1486,

6    1490 (9th Cir. 1990).

7        Here, as Appellants themselves repeatedly admit: Uber "was required to enter

8    into the Indemnification Agreement as a condition of hiring Mr. Levandowski"

9    (AOB 30:4-5); the litigation "resolved by the Uber Main Payment" involved

10   "Levandowski's claim of indemnification for [Google's] claims [against him], *i.e.*,

11   claims based on the Indemnification Agreement" (AOB 18:15-19); and, thus, "[t]he

12   Uber Main Payment was made pursuant to the Indemnification Agreement" (AOB

13   28:14-15).  (*See also* AOB 2:15-17, 5:5-11, 27:23-25, 30:19-22; 33:6-8.)

14   Accordingly, as Appellants themselves argue (AOB 18:26-19:2), the Court should

15   "engage in the fiction of treating the settlement proceeds … as if they had been

16   received from [Uber] in satisfaction of [its] alleged promise" to indemnify

17   Levandowski under the Indemnification Agreement.  *Getty*, 913 F.2d at 1491.

18       Because the Indemnification Agreement governed a component of

19   Levandowski's compensation from Uber commonly provided for in employment

20   contracts of highly-paid employees like Levandowski[5], this case is analogous to

---

21   suggest—nor did the Taxing Authorities argue below—that the Uber Main Payment falls under
22   any of the thirteen other sources of 'gross income' identified in Section 61" besides income from
     discharge of indebtedness.  (AOB 13, n. 4.)  This is irrelevant.  IRC section's 61(a)'s list of items
23   of income is non-exhaustive, and this Court may affirm on any ground supported by the record,
     and on different reasoning from the Bankruptcy Court's.  *Atel Fin. Corp.*, 321 F.3d at 926.
24   Moreover, Appellants' assertion is wrong.  In its Remand Brief to the Bankruptcy Court, FTB
     clearly argued both "Section 61(a)'s general definition of gross income, as well as the specifically
25   listed examples of 'Income from discharge of indebtedness' and 'Compensation for services.'"
     (4-ER-Trust, Ex. 44, at 4:18-21; *id.* at 1:17-19, 6:21-24, 13:18-22.)

26       [5] *E.g., In re Johnson*, 117 B.R. 461, 466 (Bankr. D. Minn. 1990) (contract "included
     indemnification, non-competition, and confidentiality provisions typical of contracts for the
27   employment of high-level managerial and professional personnel"); *United States v. Stein*, No. S1
     05 CRIM. 0888 LAK, 2007 WL 91350, at *6 (S.D.N.Y. Jan. 8, 2007) ("indemnification and

                                                                                    (continued…)

others where employees settled claims against their employers for breach of an

employment contract and the settlement was held to be taxable as compensation for

services:

> [W]hat petitioner in the present case received in compromise or
> settlement of his claims for breach of his employment contract must be
> held to be compensatory, and fully taxable as ordinary income.  What he
> was suing for was commissions, upon which he would have been fully
> taxable as compensation for services; what he received when he
> compromised his suit must be held to have been impressed with that
> same compensatory, taxable character.

*Henry v. Comm'r of Internal Revenue*, 62 T.C. 605, 606 (1974); *Putchat v.

Comm'r*, 425 F.2d 737, 737 (3d Cir. 1970).  Because the Ninth Circuit's "nature of

the underlying action" test erases any distinction for tax purposes between settled

and fully-litigated claims (*Getty*, 913 F.2d at 1490), this case is likewise subject to

the general rule that "[c]ontract damages for breach of an employment contract are

taxed to the employee as ordinary income."  (8P1 Nichols Cyc. Legal Forms §

184:84; *Alexander v. Comm'r*, 69 T.C.M. (CCH) 1792 (T.C.), *aff'd sub nom.*

*Alexander v. I.R.S.*, 72 F.3d 938 (1st Cir. 1995) ("damages received for breach of an

employment contract are in the nature of compensation and taxable as ordinary

income to the recipient"); *Heyn v. Comm'r*, 39 T.C. 719, 720 (1963).

Furthermore, because the Ninth's Circuit's approach, as applied here, requires

engaging in the fiction that an employer's settlement payment to an employee is

made in satisfaction of the terms of employment (*see Getty*, 913 F.2d at 1491), this

case is also analogous to others where courts have found taxable income to

employees from their employers' payment of the employees' liabilities.  Those

cases include *Old Colony*, in which the Supreme Court held that a company's

payment of its president's income taxes was taxable income to him.  279 U.S. at

advancement provisions [] are common in corporate charters, by-laws, and employment
contracts"); § 2.12 Indemnification and Contribution, Civ. Qui Tam Actions 1951357
("Contractual indemnification provisions also are widespread in the employment contracts of
corporate officers and directors."); Ryan H. Nelson, *Workplace Harasser Liability: Assailing
Moral Hazards and Rehabilitating the Individualist Approach*, 89 Tenn. L. Rev. 957, 990 (2022)
("highly-paid employees often will negotiate for indemnification provisions in their employment
contracts.").

12

729.  Stripped to their essentials, *Old Colony* and this case are on all fours.  In both cases: (A) an employee received regular compensation from his employer;[6] (B) the employee incurred a legal obligation to part with some portion of that compensation;[7] and (C) the employer discharged that obligation by paying the entity to which it was owed.[8]

The United States Tax Court has also issued a number of decisions holding employers' payment of their employees' liabilities to be taxable income on facts even more analogous to those here.  *Huff v. Comm'r of Internal Revenue*, 80 T.C. 804, 814-15 (1983) (holding that, "[g]enerally, payments by another on behalf of the taxpayer constitute the realization by the taxpayer of gross income of one sort or another," and that company's payment of civil penalties imposed on employees for acts in the course of employment was gross income to employees); *Matula v. Comm'r*, 40 T.C. 914, 916–17, 921 (1963) (union's payment of secretary-treasurer's legal fees and expenses was taxable income to him; court found "the result was the same as if the union had paid the amounts involved to the petitioner and he had, in turn, made payments to his lawyers for their fees and expenses"); *Sachs v. Comm'r*, 32 T.C. 815, 819–20, 822 (1959), *aff'd,* 277 F.2d 879 (8th Cir. 1960) (company's payment of fines and costs imposed on president in criminal proceedings for filing fraudulent returns on company's behalf was taxable income to president).

---

[6] In *Old Colony*, this was the president's compensation from the company on which he incurred an income tax liability.  Here, it was Levandowski's compensation from Google.

[7] In *Old Colony*, this was the portion of the president's compensation that was required to be paid as income tax.  Here, it was whatever portion (even if 100%) of Levandowski's compensation from Google he was required to disgorge pursuant to the Judgment.

[8] In *Old Colony*, this was the company's payment to the government of its president's income taxes.  Here, it was the Settlement Payment from Uber to Google.

## II. APPELLANTS' ARGUMENTS THAT THE SETTLEMENT PAYMENT IS NOT GROSS INCOME ALL FAIL

### A. Appellants' Reliance on the "Complete Dominion" Requirement of *Glenshaw Glass* Is Unavailing

Citing *Glenshaw Glass*, Appellants argue "[t]he Supreme Court has defined 'income' in Section 61 to mean 'accessions to wealth, clearly realized, and over which the taxpayers have complete dominion.'"  (AOB 9:10-11.)  Appellants then argue that "Levandowski did not have anything close to 'dominion'—let alone 'complete dominion'—over the Uber Main Payment," and that "[t]he Bankruptcy Court erred as a matter of law by discarding *Glenshaw Glass's* definition of income."  (AOB 11:12-13, 10:14-15.)  These arguments fail for two reasons.  First, *Glenshaw Glass's* standard for finding gross income is by no means exclusive. Second, that standard is met here.

#### 1. *Glenshaw Glass's* "Complete Dominion" Standard Is Not Exclusive

Appellants acknowledge that, in *Moore v. United States*, 36 F.4th 930, 937 (9th Cir. 2022), *aff'd,* 602 U.S. 572 (2024), the Ninth Circuit held that "*Glenshaw Glass* does not offer what is a 'universal (or even broadly applicable) test' for income today."  (AOB 10:18-19.)  Yet they also describe *Glenshaw Glass* as "the touchstone for discerning income" (AOB 1:19-21) and assert that both the Ninth Circuit and the Ninth Circuit Bankruptcy Appellate Panel (BAP) have "repeatedly recognized that 'income' under Section 61 means" what *Glenshaw Glass* supposedly said it meant.  (AOB 9:23-10:13.)  But *Glenshaw Glass* was decided on facts very different from those here, and, as *Moore* makes clear, its application is limited to those facts.

*Glenshaw Glass* does not address whether a third party's payment of a taxpayer's obligation is gross income, as the cases discussed above clearly demonstrate it can be.  It merely holds that money received by plaintiffs for punitive damages is taxable income, stating: "Here we have instances of undeniable

14

accessions to wealth, clearly realized, and over which the taxpayers have complete

dominion." 348 U.S. at 431. That the Supreme Court found *Glenshaw Glass's* fact

pattern *sufficient* to show gross income does not mean that fact pattern is *essential*

to show gross income. What the Supreme Court said over 80 years ago in *Armour*

*& Co. v. Wantock*, 323 U.S. 126 (1944), rings just as true now:

> It is timely again to remind counsel that words of our opinions are to be
> read in the light of the facts of the case under discussion. To keep
> opinions within reasonable bounds precludes writing into them every
> limitation or variation which might be suggested by the circumstances of
> cases not before the Court. General expressions transposed to other facts
> are often misleading.

*Id.* at 132-133.

The Ninth Circuit in *Moore* held essentially as much – and more – as to

*Glenshaw Glass* and a prior case, *Eisner v. Macomber*, 252 U.S. 189 (1920):

> The Moores' reliance on these cases is misplaced: the Supreme Court,
> our court, and other courts have narrowly interpreted *Macomber* and
> *Glenshaw Glass*, and *Glenshaw Glass's* definition is not applicable here.
>
> First … [i]n *Macomber*, the Court was clear that it was only providing a
> definition of what 'income may be defined as,' (citation), not a universal
> definition. *Glenshaw Glass* reiterated the limited scope of *Macomber*'s
> definition of income by emphasizing that … it was not meant to provide
> a touchstone to all future gross income questions.' (Citation.) *Glenshaw*
> *Glass* similarly cabined the definition of income it used, prefacing its
> definition of income by saying 'here we have instances of,' signaling that
> the Court was focused on the specific facts before it. (Citation.) The
> Court in *Glenshaw Glass* never stated or suggested that the definition it
> used was a universal (or even broadly applicable) test …. Second, the
> Supreme Court has subsequently made clear that *Macomber* and
> *Glenshaw Glass* do not provide a universal definition of income ….
> Third, we have not adopted the definition of income the Moores
> advocate.

*Moore*, 36 F.4th at 937. While Appellants correctly note that *Moore* involved

realization, *Moore* cannot plausibly be read as anything other than a broad

renunciation of any effort to suggest that factors relevant in *Glenshaw Glass* are the

exclusive factors to determine taxable income.

The strings of cases from the Ninth Circuit, the Ninth Circuit BAP, and other

jurisdictions (AOB 11:2-11) Appellants cite as applying the *Glenshaw Glass* factors

have no bearing here, as Appellants fail to analogize the facts in those cases to this

15

1    one's or to claim that the court in any of those cases refused to find gross income on

2    facts like those here.

### 2. *Glenshaw Glass's* "Complete Dominion" Standard Is Satisfied Here

Even if the "complete dominion" prong of *Glenshaw Glass* was required to

find gross income, that prong is satisfied here.  Appellants make that case

themselves by relying upon *Helvering v. Horst*, 311 U.S. 112 (1940) (*Horst*) and

*Rutkin v. United States*, 343 U.S. 130 (1952).  Appellants cite *Horst* as

"recogniz[ing] that whether funds should constitute income may depend on whether

the taxpayer 'has made such use or disposition of his power to receive or control the

income as to procure in its place other satisfactions which are of economic worth,'"

which Appellants say is, "[i]n other words, 'complete dominion.'"  (AOB 10:27-

11:2.)  Appellants cite *Rutkin* as "explaining that a payment 'constitutes taxable

income when its recipient has such control over it that, as a practical matter, he

derives readily realizable economic value from it.'"  (AOB 11:24-27.)[9]

Levandowski clearly had "control" over the Settlement Payment, in that he

could withhold his signature to the Settlement Agreement until it contained terms

acceptable to him: that the Settlement Payment be made by Uber to Google and

that, in exchange, Google release Levandowski.  That release constituted the "other

satisfactions which are of economic worth" to Levandowski (*Horst*, 311 U.S. at

116) and the "readily realizable economic value from" the Settlement Payment to

him.  (*Rutkin*, 343 U.S. at 137.)

Appellants cite *Tarpey*, 78 F.4th at 1131, and *Comm'r v. Indianapolis Power*

*& Light Co.*, 493 U.S. 203, 211 (1990), as holding that, "in determining whether a

_____

[9] As Appellants note (AOB 11:27-28), *Rutkin* did proceed to state that the foregoing "occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will."  343 U.S. at 137.  However, it is clear this following language was but an illustration of the preceding language and not a limitation on it. The Supreme Court has subsequently cited the first part of what *Rutkin* said as stating a "broad principle[]," without citing the second part at all.  *James v. United States*, 366 U.S. 213, 219 (1961).

1   taxpayer enjoys 'complete dominion' over a given sum … the key is whether the

2   taxpayer has some guarantee that he will be allowed to keep the money." (AOB

3   11:21-23.)  Those cases are distinguishable.  *Tarpey* involved a taxpayer running a

4   tax avoidance scheme involving donating timeshares to his supposed charity, where

5   the funds were deposited into a fake escrow account, "as evidenced by the

6   comingling of funds from multiple donors and frequent bulk transfers." 78 F.4th at

7   1131.  This meant the taxpayer had "some guarantee that [he] will be allowed to

8   keep the money." *Id*.  *Indianapolis Power* involved a utility company requiring

9   higher risk customers to pay deposits into escrow, 493 U.S. at 204-205, with the

10  court finding that because the deposits could be refunded or applied to the

11  customers' bills by customer choices and conduct, the utility company did not have

12  complete dominion over the deposits, making them nontaxable.  *Id*. at 211-212.

13  These are inapposite to the scenario here, where "A owes B a debt, and C pays the

14  debt on A's behalf." *Sinyard*, 268 F.3d at 758.[10]

15      Appellants fare no better with their other arguments.  Appellants argue that

16  "Levandowski had no control over the disposition of the Uber Main Payment *once*

17  *Uber made that payment*, nor any possibility of keeping the payment for himself."

18  (AOB 12:17-18, added italics.)  That is irrelevant.  The same could be said of the

19  corporate president whose company paid the government his taxes in *Old Colony*, a

20  case whose vitality the Supreme Court has reaffirmed post-*Glenshaw Glass*.

21  *Diedrich*, 457 U.S. at 195-96.

22      Appellants argue "[t]he Uber Main Payment was a settlement payment made

23  *by Uber to Google* to compensate Google for its asserted damages," and "[a]t no

24  point could Mr. Levandowski ever direct that the payment be made elsewhere."

25  (AOB 11:13-16, original italics.)  However: (1) Levandowski would not want to

---

26      [10] While Appellants also argue under *Indianapolis Power* that whether a payment is
income depends on the parties' rights and obligations at the time the payment is made (AOB
27  11:28-12:2, 12:21-23), when the Settlement Payment was made here, Levandowski had the right
to obtain a release from Google and Google had an obligation to release him, as reflected by
28  Appellants' own description of the Global Resolution.  (AOB 5:13-18.)

direct that the payment be made elsewhere than to Google, which was the party with a $179 million judgment against him, representing 98% of filed claims in his bankruptcy case; (2) Levandowski is in fact responsible for directing that the payment be made to Google, pursuant to the Settlement Agreement which he could decide whether or not to sign; and (3) the Settlement Payment not only compensated Google for its damages but benefited Levandowski as well, by obtaining his release from Google.  Given that benefit to Levandowski, that the Settlement Payment was made by Uber to Google is irrelevant, as "[t]he form of the payment is expressly declared to make no difference." *Old Colony*, 279 U.S. at 729 (finding it "immaterial that [corporate president's] taxes were directly paid over to the government" by company instead of first to him).  Indeed, "it is well settled that in reading regulatory and taxation statutes, 'form should be disregarded for substance and the emphasis should be on economic reality.'" *United States v. Eurodif S. A.*, 555 U.S. 305, 317–18 (2009) (*Eurodif*).

The economic reality here is that, before the Settlement Payment, Levandowski was liable to Google on a $179 million judgment, while after it he was not.  Given the patent legal significance of that economic reality under *Old Colony* and the other cases cited above, it does not help Appellants to cite *Ruben v. Comm'r of Internal Revenue*, 97 F.2d 926, 927 (8th Cir. 1938), to argue that, "[b]y virtue of the Global Resolution, Mr. Levandowski was 'personally spared, but he did not get anything for himself except his release—he was 'not enriched.'"  (AOB 12:10-15.)  *Ruben* is distinguishable, and to argue that Levandowski did not get anything for himself *except his release from a $179 million judgment against him* effectively concedes the point.  In contrast to the facts here, in *Ruben*:

- There was never "any determination that Mr. Ruben had personally received or kept [any disputed] amount of money or property for himself" (unlike Levandowski, who received $127 million in compensation from Google that the Settlement Payment saved him from having to disgorge under the Judgment);

18

- "[I]t [was] not shown that the Northwest Company [which paid the settlement amount] was moved to make the compromise settlement to any extent because of its duty to indemnify Mr. Ruben" (unlike here, where Appellants have repeatedly stated that Uber made the Settlement Payment under the Indemnification Agreement's term requiring it to indemnify Levandowski); and

- The court indicated that whatever benefit might have accrued to Ruben from the settlement payment by his company, of which he was a one-fourth owner, was equal to or outweighed by the detriment to him, i.e., the settlement payment covered claims against the company that went beyond those against Ruben individually, and the cost of the settlement "payment he shared in indirectly as a stockholder" (unlike Levandowksi, who has never argued or presented evidence that he owns any material share of Uber). 97 F.2d at 927-28.

Appellants mischaracterize *Sinyard* when they say that, based on *Ruben*, "*Sinyard* recognizes that 'a corporation's settlement of a suit also affecting the taxpayer' is an instance in which the taxpayer does not recognize gross income." (AOB 12:8-10.) The relevant portion of *Sinyard* actually reads:

> The Sinyards have scoured the reports to find cases supporting their contention. What they have found, for example, are a corporation's arrangement to make payments to preserve its franchise, (citation); a trust in lieu of alimony, (citation); and a corporation's settlement of a suit also affecting the taxpayer, *Ruben v. Commissioner,* 97 F.2d 926 (8th Cir.1938). *These cases rest on facts peculiar to themselves* …

268 F.3d at 758-59 (added italics).

While the Ninth Circuit's statement that *Ruben* rests on facts peculiar to itself should put the matter to rest, it also bears noting that the Tax Court in *Sachs* and *Huff* distinguished *Ruben* on facts closer to those here. The court in *Sachs* found it notable that "the corporation was not a party to the criminal proceeding and the fine in question was not imposed upon it" (32 T.C. at 822), just as here Uber was not a party to the Arbitration (or Levandowski's underlying criminal case) and the

1  Judgment was not imposed on Uber. *Huff* distinguished *Ruben* on similar grounds.

2  80 T.C. at 817.

3      Moreover, *Sachs* and *Huff* both explicitly refused to glean from *Ruben* the

4  principles Appellants do. In finding there was taxable income to the company's

5  president from its payment of criminal fines and costs imposed on him, the *Sachs*

6  court expressly rejected the president's arguments "that he was not enriched by the

7  payment by the corporation, that he was merely indemnified against the loss to

8  which he was subjected by his conduct of the corporate affairs," and "that his net

9  worth was not increased." 32 T.C. at 820. The *Huff* Court stated:

10      Petitioners also cite *Ingalls, Ruben,* and *Parker* for the proposition that
    "when an employer makes a payment in order to satisfy and extinguish
11      its own legal obligation the payment by the employer does not result in
    taxable income to the Petitioners, even though they also derive an
12      incidental benefit from such payment." Surely, such a rule of law would
    eliminate much of the income tax, since it applies literally to virtually all
13      payments of compensation, dividends, interest, rent, royalties, and the
    items catalogued in section 61(a). The Internal Revenue Code does
14      not—neither in terms nor in necessary implication—direct such a result.

15  *Huff*, 80 T.C. at 817–18. The *Huff* court further stated: "if we were to assume that

16  Products had successfully managed … to become liable for the civil penalties

17  imposed on petitioner-husbands, then we would conclude that Products incurred the

18  obligation to pay petitioner-husbands' civil penalties as compensation for their

19  services as employees." 80 T.C. at 824 n.14. In sum, *Ruben* is distinguishable,

20  conflicts with, and is less worthy of following than, cases finding taxable income

21  on facts closer to those here.

22      **B.    The Court Need Not Decide Whether the Settlement Payment
        Was Gross Income in the Form of Discharge of Indebtedness,**
23      **and, Even if It Does, Levandowski Cannot Exclude the
        Settlement Payment Under IRC Section 108 Because the**
24      **Payment Was Compensation for Services**

25  Appellants argue:

26  The Uber Main Payment is not 'discharge of indebtedness,' and, even if
    it were, it would still be excluded from gross income under the statutory
27  exception for discharges of indebtedness that occur during bankruptcy.

28

(AOB 13:1-3.)  The Court need not decide either question because it may affirm on any basis supported by the record, *Atel Fin. Corp.* 321 F.3d at 926, and, as discussed above, the Settlement Payment was income from compensation for services under IRC section 61(a)(1).

Moreover, Appellants are wrong to the extent they suggest that any income associated with a discharge of indebtedness is necessarily treated, for tax purposes, as "income from discharge of indebtedness" under IRC section 61(a)(11).  That subsection "does not apply if a cancellation or release of indebtedness is simply the medium for payment of some other form of income such as compensation for services being paid by an employer to an employee."  *Neff v. Comm'r*, 104 T.C.M. (CCH) 222 (T.C. 2012), at *pp. 21-22 (2012) (*citing Spartan Petroleum Co. v. U.S.*, 437 F. Supp. 733, 736 (D.S.C. 1977)).  Where, as here, the discharge of indebtedness is made as compensation for services, it is treated for tax purposes *as* compensation for services, even if in the *amount* of the discharge.  26 C.F.R. § 1.61-12 ("If, for example, an individual performs services for a creditor, who in consideration thereof cancels the debt, the debtor realizes income *in the amount* of the debt *as compensation* for his services.") (added italics).

The income exclusions under IRC "section 108 only appl[y] to 'pure' cancellation of indebtedness income," not cases where, as here, "the cancellation of indebtedness was only the method that gave rise to another type of income." *OKC Corp. v. Comm'r*, 82 T.C. 638, 648-649 (1984); *Spartan Petroleum Co.*, 437 F. Supp. at 736.  *Spartan* illustrates this concept:

> [C]ancellation of indebtedness can be simply the medium through which other types of income arise.  For example, if an employee owes his employer $100 and renders $100 worth of services for the employer in return for the employer's cancellation of the indebtedness, the employee has received personal service income of $100.  That income is not cancellation of indebtedness income because the cancellation is merely the medium for payment of other income, and is not the source of the income itself.

*Id*. at 736.

21

1    This concept applies here.  The Court engages in the fiction of treating the

2    Settlement Payment as received from Uber in satisfaction of its alleged promise to

3    indemnify Levandowski under the Indemnification Agreement, *Getty*, 913 F.2d at

4    1491, and Google's cancellation of Levandowski's debt under the Judgment, in

5    exchange for the payment, is thus the medium for payment of compensation to

6    Levandowski under the Indemnification Agreement.

7         Appellants cite the Bankruptcy Court's statement that "the Uber Main

8    Payment constituted gross income from the discharge of debt" (1-ER-Trust-0012),

9    apparently to suggest that, if this Court agrees, then it must also find the payment

10   subject to exclusion from gross income under IRC section 108.  (AOB 12:26-28,

11   13:14-14:16.)  However, applying IRC sections 61(a)(11) and 108 is not necessarily

12   simple[11], and Appellants did not argue to the Bankruptcy Court that the Settlement

13   Payment was not income from discharge of indebtedness under IRC section

14   61(a)(11) due to authorities like those FTB cites above, or *United States v.*

15   *Centennial Sav. Bank FSB*, 499 U.S. 573 (1991), which Appellants now cite to

16   argue (to similar effect) that section 61(a)(11) does not apply because "Google did

17   not cancel or forgive Mr. Levandowski's obligation under the Arbitration

18   Judgment," but rather it was "transferred … to Uber, which then made the Uber

19   Main Payment."  (AOB 13:4-14; 4-ER-Trust-0960-0984, Ex. 43 [opening brief on

20   remand]; 1143-1158, Ex. 46 [reply brief on remand].)  Furthermore, the Bankruptcy

21   Court's Order on Remand does not mention such issues or authorities, or IRC

22   section 108, and there is no indication the Bankruptcy Court considered whether,

23   even if "the Uber Main Payment constituted gross income from the discharge of

24   debt" in general, it constituted "'pure' cancellation of indebtedness income," *OKC*

25

26   _____

[11] Courts "must examine all the surrounding circumstances to determine whether the
27   discharge of indebtedness results in 'pure' income therefrom or whether the debt is discharged as
a means of making an indirect payment for services, property, or other purposes."  *OKC Corp.*, 82
28   T.C. at 649; *see also id.* at 648 (noting that "a discharge of indebtedness may constitute a
payment for services" or "may constitute a payment for the settlement of a litigated claim").

*Corp.*, 82 T.C. at 649, subject to exclusion under IRC section 108.  (1-ER-Trust-0001-0034, Ex. 1.)[12]

### C.    Appellants Have Not Demonstrated that Any Other Exclusion from Gross Income Applies

#### 1.    The Settlement Payment Was Not Akin to a Nontaxable Insurance Payment

##### a.    The Settlement Payment was not nontaxable as returning "lost capital" to Levandowski in the manner of accident, health, or similar insurance payments

Appellants argue the Settlement Payment was nontaxable as a return of capital.  (*E.g.*, AOB 16:6-18.)  However, the gist of the argument is that it was Google's lost capital that was returned.  (AOB 16:19-21, 17:1-3.)  Whether the Settlement Payment returned lost capital from Google's perspective is irrelevant to whether it is an exclusion from gross income for Levandowski.

From Levandowski's perspective, the Settlement Payment effectively returned lost compensation: the compensation from Google that he would have had to disgorge under the Judgment but for the Settlement Payment.  As Appellants acknowledge, the principal effect of the Judgment was "to claw back previously earned *compensation* based on Mr. Levandowski's breach of contracts and duty of loyalty to Google."  (AOB 16:21-22, added italics.)  That Uber paid Google directly, instead of Levandowski paying his compensation back to Google and then being reimbursed by Uber, is irrelevant.  *Old Colony*, 279 U.S. at 729; *Eurodif*, 555 U.S.  at 317–18.

Once again, Appellants' own authorities undermine their argument.

---

[12] While FTB cannot perform a computation because Appellants have persistently redacted and refused to disclose the amount of the Settlement Payment (*e.g.,* AOB 5, n.2; 4-ER-Trust-1041-1044, Ex. 45), whatever was paid pursuant to the Indemnity Agreement is taxable as compensation to Levandowski.  *Sinyard*, 268 F.3d at 758; *Old Colony*, 279 U.S. at 729.  To the extent the amount of the Settlement Payment was less than that of the Judgment, any argument by Appellants on reply that the difference would, if income, constitute pure cancellation of indebtedness income, subject to exclusion under IRC section 108, would not be properly before the Court due to Appellants' prior failure and refusal to disclose the amount of the Settlement Payment.  Any such argument would also conflict with Appellants' argument that "Google did not cancel or forgive Mr. Levandowski's obligation under the Arbitration Judgment."  (AOB 13:10-11.)

23

1   Appellants cite Justice Frankfurter's concurrence from *United States v. Kaiser*, 363

2   U.S. 299, 311 (1960) as stating that "the principle at work here is that payment

3   which compensates for a loss of something which would not itself have been an

4   item of gross income is not a taxable payment."  (AOB 15:18-21.)  But

5   Levandowski's compensation from Google clearly would "itself have been an item

6   of gross income."  (*Id.*)  For Levandowski to have to pay that compensation back to

7   Google under the "claw back" of the Judgment would be a loss of something that

8   was an item of gross income.  For Uber to then reimburse him (which is the

9   substance of what happened, regardless of form) would, in turn, compensate for a

10  loss of compensation which itself was an item of gross income.

11      Appellants cite *O'Gilvie v. United States*, 519 U.S. 79 (1996), and *Reese v.

12  United States*, 28 Fed. Cl. 702 (1993), to argue that accident and health insurance

13  payments are excluded from gross income (AOB 14:22-15:6) because such

14  payments, as stated in *O'Gilvie* (quoting from a 1918 Attorney General Opinion)

15  "substitute capital which is the source of *future* periodical income merely taking the

16  place of capital in human ability which was destroyed by the accident."  519 U.S. at

17  85 (original italics); *Reese*, 28 Fed. Cl. at 708 (quoting same part of same Attorney

18  General Opinion).  Had Levandowski been disabled by an accident and had his

19  ability to earn "*future* periodical income … destroyed by the accident," and had the

20  Settlement Payment "substitute[d]" for such "capital in human ability" (*id.*), then it

21  may well have been a return of capital to Levandowski.  But that is not what

22  happened here.

23      Here the Settlement Payment effectively substituted for Levandowski's lost

24  *past* income, *i.e.*: (1) his compensation from Google (which the Judgment otherwise

25  would have required him to disgorge); and (2) his owed compensation from Uber,

26  in the form of indemnity pursuant to the Indemnification Agreement, under which

27  the Court engages in the fiction that the Settlement Payment was made.  *Getty*, 913

28  F.2d at 1491.  Therefore, again, this case is analogous to ones holding that

24

settlement awards on claims under employment contracts are substitutes for the promised compensation and taxable as such. *Henry*, 62 T.C. at 606; *Putchat*, 425 F.2d at 737.

Because the Settlement Payment so clearly was not a return of lost capital from Levandowski's perspective, Appellants gain nothing from their string cites to various cases for general propositions concerning the tax treatment of returns or replacements of lost capital. (AOB 15:9-18, 17:5-14.) Appellants make no effort to analogize those cases to this one on their facts.

Appellants gain nothing more from the one case they do try to analogize to this one, *Clark v. Comm'r*, 40 B.T.A. 333 (1939). *Clark* is readily distinguishable. There, the taxpayer suffered a loss because his tax counsel's negligence caused him to pay more in taxes than he should have, and the court held the tax counsel's voluntary payment to the taxpayer of the difference was not taxable. *Id.* at 334-35. It is misleading for Appellants to describe that voluntary payment with the words "indemnified" and "indemnity" (AOB 17:21-22), words that appear *nowhere* in *Clark*. Unlike in this case, in *Clark*: (A) there was no agreement to indemnify against legal liability as a form of taxable compensation from a new employer; and (B) nor was the supposed "indemnity" against having to disgorge taxable compensation from a prior employer.

### b. The Settlement Payment was not akin to insurance under the test of *AMERCO & Subsidiaries v. Commissioner*

Appellants argue "[t]he Bankruptcy Court [] erred by concluding that the Uber Main Payment was not analogous to insurance under the three-factor test set forth in *AMERCO*." (AOB 19:3-5.) *AMERCO* provides: "(1) that an insurance transaction must involve 'insurance risk;' (2) that insurance involves risk-shifting and risk-distributing; and (3) that, in the absence of a statutory definition, 'insurance' is to be defined in its commonly accepted sense." 96 T.C. at 38. *AMERCO* further states that "matters of Federal income taxation must be resolved

25

with principles of Federal income taxation borne in mind." *Id.* The Settlement Payment fails *AMERCO's* test for insurance because: (1) the Indemnification Agreement and Settlement Payment did not meet commonly accepted notions of insurance; (2) there was insufficient risk distribution; and (3) the Bankruptcy Court correctly concluded that principles of federal income taxation weigh in favor of finding gross income here.

### (1)    The Indemnification Agreement and Settlement Payment did not meet commonly accepted notions of insurance

To analyze whether an arrangement meets commonly accepted notions of insurance, federal courts "look at numerous factors, including whether … the policies were valid and binding" and "whether the policies covered typical insurance risks." *Avrahami v. Comm'r of Internal Revenue*, 149 T.C. 144, 191 (2017). Neither factor applies here. The Judgment was in principal part for disgorgement of Levandowski's compensation from Google, based on his breaches of duty in aiding Google's competitor Uber. Under California law, it is "well established that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired." *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1266 (1992).

That rule is not limited to California. Appellants argue that "[t]he 'insurance risk' here is similar to insurance policies that provide coverage to directors and officers for potential employment-related litigation" (AOB 20:15-16), *i.e.,* "D&O" policies, and, if the Indemnification Agreement were analogous to any type of insurance policy, that would be the one. However, "[t]he D&O policy is not intended to protect directors and officers from liability for their receipt of personal profits, or improper gains or advantages to which they are not legally entitled. Almost all D&O policies exclude coverage for such claims." Tort & Ins. Practice Section, Am. Bar Ass'n, Chapter 8: Policy Exclusions, Directors & Officers Liability Ins. Deskbook Ch. 8.

The Indemnification Agreement and Settlement Payment also did not cover typical insurance risks due to the willful, intentional misconduct at issue. As found in the Arbitration Award against Levandowski and his co-respondent:

- "The breach of loyalty claim is based on [Respondents'] proposal not only to sell the company to Uber but to do so in a way that would harm Google."

- "Respondents were fully aware and intended that the sale of Otto's technology to Uber would give Uber a significant competitive advantage over Google."

- "Levandowski told Uber that taking a team of Google employees to Uber would damage Google because they were going right across the street to the competitor."

- "Respondents believed that the loss of this Google team to Uber could have a 'distressing hit on the valuation' and that [Google] Chauffeur's 'valuation would be much lower.'"

- "Respondents wanted their plan to have added effectiveness by having the solicited employees stage a mass walk-out." And

- "[I]n anticipation of the devastating damages that their plan was expected to inflict on Google, and the consequent risk that Google would seek to recoup those damages from them, Respondents sought and obtained an agreement from Uber to indemnify them for their 'Bad Acts.'" (FTB's Excerpts of Record, 062-063.)

Such conduct falls well outside California Insurance Code section 22's definition of insurance as "a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." That code section has been cited as prohibiting insurance against nonaccidental harm inflicted by the insured. *Chu v. Canadian Indem. Co.*, 224 Cal. App. 3d 86, 94–95 (1990); *Upper Deck Co. v. Endurance Am. Specialty Ins. Co.*, 2011 WL 6396413, at *7 (S.D. Cal. Dec. 15, 2011). Insuring such conduct would also be specifically prohibited by California Insurance Code section 533, which prohibits

coverage of "deliberate conduct that the insured expected or intended to cause damage." *Certain Underwriters at Lloyd's London v. ConAgra Grocery Prod. Co., LLC*, 77 Cal. App. 5th 729, 740 (2022). "The appropriate test for 'expected' damage is whether the insured knew or believed its conduct was substantially certain or highly likely to result in that kind of damage." *Id.* That test is easily met by the arbitrators' foregoing findings.

This exclusion is not limited to California. "Most liability policies contain an exclusion of liability for injury intentionally caused by the insured." 20 A.L.R.3d 320. More specifically:

> Contemporary liability insurance policies generally provide coverage on an 'occurrence' basis, which is most often defined to mean, in pertinent part, an accident which results in bodily injury or property damage neither expected or intended from the standpoint of the insured.

31 A.L.R.4th 957. "[T]he courts have generally rejected the view that the insured must have had the specific intent to cause the type of injury suffered in order to render applicable an intentional injury exclusion clause in a liability insurance policy," and, "[w]here the courts have explicitly construed the term 'expected' for purposes of the intentional injury exclusion clause, they have generally stated that the term means a high degree of certainty or probability, or some variation of this language." *Id.* Thus, the general exclusion is either the same as or broader than California's.

The foregoing demonstrates the fallacy in Appellants' argument that, "[i]f indemnified officers, directors, employees, and agents were required to pay taxes on indemnification payments, it would undermine th[e] purpose" of D&O policies. (AOB 20:24-21:5.) No D&O policyholders are paying taxes on indemnification payments like the Settlement Payment because D&O policies do not indemnify against the sort of damages (disgorgement of ill-gotten gains) and actions (intentionally injurious ones) found here. Furthermore, the *Huff* court expressly *rejected* the taxpayers' argument "that the inclusion of the payment of their civil

1  [penalties] by [their employer] in their gross incomes would frustrate California's

2  public policy behind indemnification of corporate directors, officers, and

3  employees." 80 T.C. at 818–20. This Court should do the same.

### (2)   There was insufficient risk distribution for there to be insurance

4

5  Risk distribution "is based on the law of large numbers—a statistical concept

6  that theorizes that the average of a large number of independent losses will be close

7  to the expected loss." *Avrahami*, 149 T.C. at 181. "By assuming numerous

8  relatively small, independent risks that occur randomly over time, the insurer

9  smoothes out losses to match more closely its receipt of premiums." *Clougherty*

10  *Packing Co. v. Commissioner*, 811 F.2d 1297, 1300 (9th Cir. 1987). Here, the risks

11  subject to the Indemnification Agreement were not "numerous" or "independent."

12  *Id.* There was a pool of no more than six potential insureds: Otto, Levandowski,

13  and four other employees. (2-ER-Trust-0436, Ex. 15.) Their risks would all arise

14  from the same transaction – the acquisition of Otto – and occur not randomly over

15  time but in the period following the acquisition.

16  FTB examined numerous cases, which uniformly indicated that adequate risk

17  distribution requires a much larger pool of risks or a large percentage of business

18  revenue.[13] Uber spreading risk over six insureds based on one transaction would

19  set a new low bar and is contrary to all relevant authority. Moreover, to the extent

20  risk distribution is measured by a percentage of a business's revenue, Appellants

21  have never offered any evidence of Uber's revenue.

22

---

23  [13] *See, e.g., R.V.I. Guar. Co. & Subsidiaries v. Comm'r*, 145 T.C. 209, 228 (2015) (annual

24  policies covered 754,532 vehicles, 2,097 properties, and 1,387,281 commercial equipment assets); *Caylor Land & Dev., Inc. v. Comm'r of Internal Revenue*, 121 T.C.M. (CCH) 1205 (T.C.

25  2021) (captive's 34 independent risks not sufficient, and consolidated group's risks heavily tied to group's central entity; strong risk correlation between smaller entities and central entity prevented

26  group from having adequate distribution); *Harper Group v. Comm'r*, 96 T.C. 45, 59 (1991) (30% of business insuring unrelated customers sufficient); *Gulf Oil Corp. v. Comm'r of Internal*

27  *Revenue*, 89 T.C. 1010, 1019 (1987) (net premium income from insurance of 2% of total annual net premium income insufficient); *AMERCO & Subsidiaries v. Comm'r*, 96 T.C. at 35, 44-45

28  (unrelated insureds comprising over 50% of captive's business sufficient); *Avrahami*, 149 T.C. at 181-190.

1
2

### (3) The Bankruptcy Court Was Correct to Conclude that Principles of Federal Income Taxation Weigh in Favor of Finding Gross Income Here

3   In its Order on Remand, the Bankruptcy Court found and concluded, citing

4   *Schleier*, 515 U.S. at 328, that "exceptions to the broad definition of what

5   constitutes gross income must be narrowly construed," and, accordingly, "general

6   principles of Federal income taxation require a determination that the

7   Indemnification Agreement and the Uber Main Payment were not analogous to

8   insurance." (1-ER-Trust-0025, Ex. 1.) The Bankruptcy Court was correct.

9   ### 2. The tax benefit rule does not apply

10   "The tax benefit rule is a [partially-codified] judicially developed doctrine

11   designed to ameliorate some of the effects of the year-end accounting system that

12   the tax system utilizes," and, under the rule's exclusionary aspect relevant here, it

13   "requires a taxpayer to include income only to the extent that a deduction gave rise

14   to a tax benefit" in a prior year. *Hudspeth v. Comm'r*, 914 F.2d 1207, 1212 (9th

15   Cir. 1990); *Est. of Backemeyer v. Comm'r of Internal Revenue*, 147 T.C. 526, 538–

16   39 (2016) (rule's "exclusionary component [] is partially codified in [IRC] section

17   111(a)"); IRC § 111(a) (gross income does not include recoveries of amounts

18   deducted in prior year to the extent such amounts did not reduce the tax imposed).

19   In support of their argument that the Settlement Payment should be excluded

20   from gross income under the tax benefit rule, Appellants repeatedly assert that

21   Levandowski suffered a loss under the Judgment. (AOB 25:20-21; 26:25-26;

22   26:28-27:2.) But Levandowski did not pay a dime on the Judgment; only Uber did.

23   To assume that Levandowski paid the Judgment, one must also assume that Uber

24   then reimbursed him. Appellants acknowledge this by describing the Settlement

25   Payment as "the recoupment of [Levandowski's] loss." (AOB 25:21-22; 26:25-26

26   ["the Uber Main Payment is a recoupment of … the loss that Mr. Levandowski

27   incurred"].) Appellants' characterization of the Settlement Payment as merely

28   recouping a loss is the apparent basis of their argument that "the tax-benefit rule

1   applies to avoid unjustly taxing Mr. Levandowski on the Uber Main Payment,

2   pursuant to which he received no corresponding increase in wealth," and which,

3   they claim, "merely revert[ed] him to the *status quo ante*." (AOB 25:17-18; 26:27-

4   28.) The argument fails.

5       While the Settlement Payment may not have put cash in Levandowski's hands,

6   for purposes of finding income it is "immaterial that the [funds] were directly paid

7   over to" someone besides the taxpayer. *Old Colony*, 279 U.S. at 729; *Sachs*, 32

8   T.C. at 820 (rejecting corporate president's arguments "that he was not enriched by

9   the payment [of his fines] by the corporation" and that, thereby, "his net worth was

10  not increased"). Appellants also misconceive the *status quo ante* by ignoring

11  Levandowski's receipt of over $127 million in compensation from Google. The

12  Settlement Payment enabled him to keep that compensation despite a judgment that

13  required him to disgorge and provide restitution of it to Google. "The status quo is

14  the last, uncontested status preceding the commencement of the controversy."

15  *Washington Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 476 (9th Cir.

16  1969); *Agric. Lab. Rels. Bd. v. Ruline Nursery Co.*, 115 Cal. App. 3d 1005, 1015

17  (1981) (same). Appellants cannot describe as "uncontested" the state of affairs

18  after Levandowski received all those ill-gotten gains subject to restitution, and

19  before the return of them to Google. Rather, "[w]ith regard to restitution, the goal

20  is to restore plaintiff to the status quo ante." *Pineda v. Bank of Am., N.A.*, 50 Cal.

21  4th 1389, 1401 (2010); *Ogden Martin Sys., Inc. v. San Bernardino Cnty., Cal.*, 932

22  F.2d 1284, 1287 (9th Cir. 1991). Thus, compared to the *status quo ante*,

23  Levandowski has gained both tens of millions of dollars in compensation and a

24  release from a judgment that would have required him to pay that *and even more* to

25  Google.

26      Thus, the true lynchpin of Appellants' argument under the tax benefit rule

27  must be the assertion "that the money returned was already taxed to Mr.

28  Levandowski once—when he received the initial compensation from Google."

31

(AOB 27:6-7.)  That lynchpin does not hold Appellants' argument together, for three reasons.  First, Appellants' assertion is not supported by any citation to the record (*id.*), and Appellants have never put any admissible evidence into the record to prove what, if any, taxes Levandowski paid on his compensation from Google. Second, to the tune of about $52 million, the assertion is incapable of being supported by any evidence, as it is simply wrong.  Levandowski cannot have already been taxed on the $52 million of the Judgment constituting interest, attorney's fees, and costs, because that was not money he received from Google as compensation.[14]  Third, the assertion is legally irrelevant in any event.

Appellants' tax benefit rule argument boils down to the notion that a payment for a taxpayer's benefit is not taxable to him unless it literally puts more cash in his pocket.  That notion is inconsistent with the fact "that 'income' may be realized by a variety of indirect means," *Diedrich*, 457 U.S. at 195, and also with the Supreme Court's admonition in *Hillsboro Nat. Bank v. Comm'r*, 460 U.S. 370 (1983) that "[t]he limited nature of the [tax benefit] rule and its effect on the annual accounting principle bears repetition."  *Id.* at 389; *see also Schwartz Rojas v. Comm'r*, 901 F.2d 810, 813 (9th Cir. 1990) (declining to apply tax benefit rule and stating: "Courts should be hesitant to create sweeping rules which are addressed to the numerous variations of a problem and which, because of their breadth and the absence of sharply defined limits, inevitably must be modified by Congress to fix more precisely their reach."); *Am. Mut. Life Ins. Co. & Subsidiaries v. United States*, 267 F.3d 1344, 1350 (Fed. Cir. 2001) ("The tax benefit rule does not guarantee dollar-for-dollar reductions of taxable income for every dollar of

---

[14] That this $52 million was not compensation to Levandowski from Google does not mean that Uber's payment to discharge Levandowski's liability for it was not income to Levandowski.  *Matula*, 40 T.C. at 921 ("If the union had not retained lawyers for petitioner and then paid their fees and costs, he would have been compelled to retain and pay his own lawyers and expenses … and the result was the same as if the union had paid the amounts involved to the petitioner and he had, in turn, made payments to his lawyers for their fees and expenses.").

deduction.").[15]

### 3. The Settlement Payment was not a Working Condition Fringe

"Gross income shall not include any fringe benefit which qualifies as a … (3) working condition fringe." IRC § 132(a)(3). "[T]he term 'working condition fringe' means any property or services provided to *an employee of the employer* to the extent that, if the employee paid for such property or services, such payment would be allowable as a deduction under section 162 or 167." (IRC § 132(d) (emphasis added). The Settlement Payment was not a working condition fringe for two reasons: **(a)** Levandowski was not an "employee of the employer" (Uber) at the relevant time; and **(b)** the payment would not, as Appellants argue, have been deductible under IRC section 162[16], which applies to "the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." IRC § 162(a). That is because the payment was instead a capital expenditure made in connection with Uber's acquisition of Otto from Levandowski under the Merger Agreement. As such, it was governed by IRC section 263, which precludes deductions.

### a. Levandowski Was Not, as Required, a Current Employee of Uber at the Relevant Time

"For purposes of section 132(a)(3) … the term 'employee' means—(i) Any individual who is currently employed by the employer." 26 C.F.R. § 1.132-1(b)(2)(i); *see also Biehl v. Comm'r of Internal Revenue Serv.*, 118 T.C. 467, 482

---

[15] In a footnote, Appellants assert that, "had Mr. Levandowski been deemed to have made the payment to Google himself, that payment would ordinarily be deductible under either Section 162 or Section 165 as a loss." (AOB 27, n. 11.) Not so. IRC section 165 only covers a "loss sustained during the taxable year and not compensated for by insurance or otherwise." IRC § 165(a). To deem the Settlement Payment a loss to Levandowski is to assume he paid Google himself. But, to assume as much, one must then also assume Uber reimbursed Levandowski, in a manner Appellants themselves argue was akin to insurance. Similarly, under IRC section 162, "[i]t is well established that an otherwise deductible business expense cannot be deducted if it has been reimbursed." (*Manocchio v. Comm'r*, 710 F.2d 1400, 1402 (9th Cir. 1983).

[16] This applies regardless of the disputed impact of the amendment of IRC section 67(g) to disallow miscellaneous itemized deductions beginning in 2018.

33

n.12 (2002), *aff'd sub nom. Biehl v. Comm'r*, 351 F.3d 982 (9th Cir. 2003) ("The regulations under sec. 132 explicitly give 'employee' the meaning we find implicit in sec. 62(a)(2)(A) [governing deductions for reimbursed employee expenses]: an employee' for purposes of sec. 132(a)(3) … is 'Any individual who is currently employed by the employer.'").  Appellants admit "Levandowski had not yet begun his anticipated employment with Uber when he entered into the Indemnification Agreement," and "he was no longer employed by Uber at the time Uber ultimately transmitted the Uber Main Payment."  (AOB 28:7-9.)  Therefore, the payment cannot be a working condition fringe.

That conclusion is not affected by Appellant's citation to the I.R.S.'s revenue ruling Rev. Rul. 92-69, 1992-2 C.B. 51 (1992).  That revenue ruling involved outplacement services provided to employees who were to be terminated.  The ruling merely provides:

> For purposes of *this revenue ruling*, if the ruling's requirements are otherwise satisfied concerning outplacement services, the requirement that an individual be currently employed when the individual receives the services will be treated as continuing to be satisfied with respect to the outplacement services during the period the services are provided."

(*Id.*) (emphasis added).  In addition, "Revenue Rulings do not have the force and effect of Treasury Department Regulations," their "conclusions … will be directly responsive to and limited in scope by the pivotal facts stated in the revenue ruling," and all "concerned are cautioned against reaching the same conclusion in other cases unless the facts and circumstances are substantially the same."  26 C.F.R. § 601.601(d)(2)(v).  The facts here are not the same, and so this ruling cannot trump the regulation's plain text.

### b.    The settlement payment would not have been deductible under IRC section 162

"Where an expenditure fits within both Section 162 and Section 263, the capitalization requirement controls and bars the deduction."  *Actavis Lab'ys, FL,*

*Inc. v. United States*, 161 Fed. Cl. 334, 353 (2022).[17]  Legal expenses incurred in connection with a merger or acquisition are capital expenditures instead of deductible business expenses.  *INDOPCO*, 503 U.S. at 88 ("National Starch has not demonstrated that the investment banking, legal, and other costs it incurred in connection with Unilever's acquisition of its shares are deductible as ordinary and necessary business expenses under § 162(a)."); *Woodward v. Comm'r*, 397 U.S. 572, 575 (1970) ("It has long been recognized … that costs incurred in the acquisition or disposition of a capital asset are to be treated as capital expenditures," and "the courts have held that legal, brokerage, accounting, and similar costs incurred in the acquisition or disposition of such property are capital expenditures."); *United States v. Hilton Hotels Corp.,* 397 U.S. 580, 583–85 (1970). Applying the relevant standard "to litigation expenses involves the simple[] inquiry whether the origin of the claim litigated is in the process of acquisition itself." *Woodward*, 397 U.S. at 577.  The answer here is clearly yes.

Appellants' assertion that "Uber theoretically could have acquired Otto's assets without the Indemnification Agreement" (AOB 30:3-4) ignores that, as discussed *supra* at p. 3, the Indemnification Agreement was executed the same day as the Merger Agreement and incorporates defined terms from the Merger Agreement, reflecting an obvious connection between the two.  The assertion is also belied by multiple statements of Appellants in their current Opening Brief[18],

---

[17] "In exploring the relationship between deductions and capital expenditures, th[e] [Supreme] Court has noted the 'familiar rule' that 'an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer.'"  *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992) ("deductions are exceptions to the norm of capitalization … strictly construed and allowed only 'as there is a clear provision therefor.'")

[18] AOB 21:8-10, 31:3-4.

35

1     their Opening Brief on Remand[19], and their initial Tax Motion[20], to the effect that,

2     "but for the Indemnification Agreement, [Levandowski] would not have sold Otto

3     to Uber," and the "Settlement Payment is payment of the arbitral award, which in

4     claim's 'origin and character' is linked to Uber's acquisition and operation of Otto."

5     (2-ER-Trust, Ex. 15, at 16:17, 19:3-5.)

6          **4.     The Settlement Payment Was Not a Deductible**
              **Reimbursement**

7

8               **a.     The settlement payment was not deductible under IRC**
                      **section 162**

9          As Appellants acknowledge, a deductible reimbursement "arrangement must

10    provide reimbursements only for business expenses deductible under Sections 161

11    through 199A" of the IRC (AOB 32:12-13), while Appellants rely solely on IRC

12    section 162 (AOB 32:20-23), and the Settlement Payment does not qualify

13    thereunder because it was instead a non-deductible capital expenditure as explained

14    *supra* at pp. 34-35.

15              **b.     The Settlement Payment Was Not an Expense Paid or**
                      **Incurred Within a Current Employment Relationship**
                      **Between Uber and Levandowski**
16

17         Section 62 requires that the expense be "paid or incurred by the taxpayer, in

18    connection with the performance by him of services *as an employee*," IRC §

19    62(a)(2)(A) (emphasis added), and the implementing regulations clarify that this

20    means "in connection with the performance of services *as an employee **of the***

21    ***employer***."  26 C.F.R. § 1.62-2(b), (d) (emphasis added).  "Congress's use of the

22    words 'performance' and 'employee' dictates that to be deductible, the reimbursed

23    expenses must be incurred during the course of employment."  *Biehl v. Comm'r*,

24    351 F.3d 982, 986 (9th Cir. 2003).  The implementing "regulations add that the

25

26         [19] 4-ER-Trust, Ex. 43, at 14:24-25, 17:23-18:2 ("The Indemnification Agreement and
      Uber Settlement Payment … [were] business expenses [] incurred as part of Uber's acquisition of
27    Otto."), 18:5-6, 19:10-11.

28         [20] 2-ER Trust, Ex. 15, at 1:17-19, 1:23-28, 16:17, 17:4-10; 18:8-19:5; 20:14-21; 21:16-
      17.)

1    performance of services must be 'as an employee *of the employer*'," and "[t]hese

2    three additional words reconfirm that the expenses must have been incurred on

3    behalf of the employer within a *current* employment relationship." *Id.* (emphasis in

4    original).

5        The expense associated with the Settlement Payment was neither paid nor

6    incurred within a current employment relationship between Uber and Levandowski.

7    The Settlement Payment was not paid until 2022, following the Bankruptcy Court's

8    granting of the Tax Motion and the Confirmation Motion, and long after Uber had

9    terminated Levandowski's employment and the two were in litigation over Uber's

10   alleged obligations under the Indemnification Agreement.  As for when the expense

11   associated with the Settlement Payment was incurred, no plausible option coincides

12   with Levandowski's employment with Uber.

13       Under the cash receipts and disbursements method of accounting,

14   "[e]xpenditures are to be deducted for the taxable year in which actually made."  26

15   C.F.R. § 1.446-1(c)(i).  This leads to the same result as analyzing Appellants'

16   deductible reimbursement argument based on when the alleged expense was paid,

17   as opposed to incurred.

18       Under the accrual method of accounting, "a liability is incurred, and generally

19   is taken into account for Federal income tax purposes, in the taxable year in which

20   all the events have occurred that establish the fact of the liability, the amount of the

21   liability can be determined with reasonable accuracy, and economic performance

22   has occurred with respect to the liability."  26 C.F.R. § 1.446-1(c)(ii).  "[W]hether a

23   business expense has been 'incurred' so as to entitle an accrual-basis taxpayer to

24   deduct it … is governed by the 'all events' test that originated in *United States v.*

25   *Anderson*, 269 U.S. 422, 441 [] (1926)." *United States v. Gen. Dynamics Corp.*,

26   481 U.S. 239, 242 (1987).  "The 'all events' test has been incorporated into the

27   [IRC] by the Deficit Reduction Act of 1984 … Section 461(h) [of which] imposed

28   limits on the application of the test, providing that 'in determining whether an

amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs.'"  *Id.* at 243 n. 3.  "It is fundamental to the 'all events' test that … liability must first be firmly established.  This is consistent with [the Supreme Court's] prior holdings that a taxpayer may not deduct a liability that is contingent."  *Id.* at 243.

Appellants admit that, while "Google filed its demand for arbitration while Levandowski was employed by Uber … the arbitration itself extended past his employment" with Uber.  (4-ER-Trust, Ex. 46, at 10:2-4.)  Thus, Levandowski's liability to Google remained contingent and not firmly established until after he was no longer employed by Uber, and the expense of the Settlement Payment cannot, as required for a deductible reimbursement, be deemed incurred within a current employment relationship between Uber and Levandowski.  In addition, the Judgment was based in part on Levandowski breaches of the duty of loyalty (1-ER-Trust-0070, Ex. 5), a fiduciary duty[21], and "[b]reach of fiduciary duty is a tort."  *1-800 Contacts, Inc. v. Steinberg*, 107 Cal. App. 4th 568, 592 (2003).  "If the liability of the taxpayer requires a payment to another person and [] arises out of any tort, economic performance occurs as the payments to such person are made," IRC § 461(h)(2)(C)(ii), here, long after Levandowski's employment with Uber ended.

### c.    The Settlement Payment Was Not Made Pursuant to an Accountable Plan

IRC section 62(a)(2)(A) applies to "a reimbursement or other expense allowance arrangement," and, as Appellants acknowledge, "the payment must have been made pursuant to an "accountable plan."  (AOB 32:11.)  However, the terms "arrangement" and "plan" "encompass a continuing relationship, rather than a one-shot payment of the type at issue in the case at hand," with "dictionary definitions

---

[21] *See, e.g., Samuelian v. Life Generations Healthcare, LLC*, 104 Cal. App. 5th 331, 357, 324 Cal. Rptr. 3d 596, 613–14 (2024); *Wittenberg v. Bornstein*, 50 Cal. App. 5th 303, 312 fn. 7 (2020); *O'Neal v. Stanislaus Cnty. Employees' Ret. Assn.*, 8 Cal. App. 5th 1184, 1218 (2017).

of 'plan' (citation) as 'a scheme for making, doing, or arranging something; a project; a program; a schedule', encompass[ing] or imply[ing] multiple elements for accomplishing something over a period of time." *Biehl*, 118 T.C. at 474. This is another reason the Settlement Payment does not meet the requirements for a deductible reimbursement.[22]

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court's Order should be affirmed.

Dated:  January 20, 2026                    Respectfully submitted,

ROB BONTA
Attorney General of California
LISA W. CHAO
Supervising Deputy Attorney General

/s/ John C. Keith

JOHN C. KEITH
Deputy Attorney General
*Attorneys for Appellee*
*California Franchise Tax Board*

---

[22] Appellants incorrectly state that "[t]he Bankruptcy Court did not otherwise consider whether the Uber Main Payment was made pursuant to an accountable plan, nor did the Taxing Authorities otherwise substantively dispute the point below." (AOB 33:9-11.) FTB did dispute that point below. (4-ER-Trust-1012, Ex. 44.)

# **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Bankruptcy Procedure 8015(a)(7)(B)(i) and 8015(h), I certify that the attached brief contains 12,990 words, according to the Microsoft Word processing system, not counting those portions of the brief excluded by Federal Rule of Bankruptcy Procedure 8015(g).

ROB BONTA
*Attorney General of California*

/S/ JOHN C. KEITH

JOHN C. KEITH
*Deputy Attorney General*
*Attorneys for Appellee*
*California Franchise Tax Board*

Appellee's Brief of FTB (4:25-cv-02713-YGR)